MWE OFFICE COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x

BIOMED PHARMACEUTICALS, INC.,                 :

                 Plaintiff,        :        Civil Action No. 1:10-cv-07427-JSR

                                 :

           v.                        :        **AMENDED COMPLAINT**

                                 :

OXFORD HEALTH PLANS (NY), INC.;               :
OXFORD HEALTH INSURANCE, INC.;                :
UNITEDHEALTH GROUP INCORPORATED,              :

                                 :

               Defendants.     :
------------------------------------------------------------- :x

      Plaintiff BIOMED PHARMACEUTICALS, INC., ("Plaintiff" or "Biomed"), as and for

its Amended Complaint against Defendant OXFORD HEALTH PLANS (NY), INC. alleges as

follows:

### THE PARTIES

      1.      Plaintiff Biomed Pharmaceuticals, Inc., a Delaware corporation, is a licensed

pharmacy and accredited home infusion company doing business in the State of New York. Its

principal place of business is located at 33 West Main Street, Suite 302, Elmsford, NY 10523.

Its headquarters are located at 950 Calcon Hook Road, Suite 15, Sharon Hill, PA 19079.

      2.      Oxford Health Plans (NY), Inc. ("Defendant" or "Oxford"), a New York

corporation, is a licensed health maintenance organization ("HMO") doing business in the State

of New York. Its headquarters are located at 1133 Avenue of the Americas, New York, NY

10036.

### JURISDICTION AND VENUE

      3.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1331, because it arises under the Constitution and laws of the United States. Furthermore, under

29 U.S.C. § 1132(e)(1), this Court has jurisdiction to hear pleas made on behalf of a beneficiary seeking to recover benefits due under the terms of a plan and to enforce his rights under a plan.

4.    Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b)(2).

## BACKGROUND

5.    Oxford contracts with employers to provide health benefits to eligible employees and dependents (collectively, "members").

6.    Oxford offers several HMO plans, including In-Network Only plans and Point-of-Service ("POS") plans.  In-Network Only plans require members to obtain all covered services from Oxford's in-network care providers.  POS plans permit more flexibility, allowing members the choice of going in-network or out-of-network for care.  Under the POS plans, members may receive contracted services from providers who have not entered into an arrangement with Oxford ("Out-of-Network Providers").  For this right of greater provider choice, insureds with POS plans pay a higher premium than do insureds with In-Network Only plans.

7.    Biomed provides intravenous and injectable medications for patients with chronic medical conditions.

8.    Biomed has not entered into an arrangement with Oxford.  Thus, in relation to Oxford, Biomed is an Out-of-Network Provider.

9.    In the instant matter, Biomed is the assignee of the rights and benefits of a minor patient (the "Patient"), who is covered as a dependent under his father's group health plan (the "Plan"), which Plan is subject to the requirements of the Employee Retirement Income Security Act of 1974, codified at 29 U.S.C.A. §§ 1001 et seq ("ERISA").  The Patient's father is a member of Oxford's Plan through his employer as a benefit of his employment.  The Plan is a contract with Oxford to provide benefits to Patient and his family through Oxford's POS option..

10.    The Patient's member identification number is ***********03.

11.     The Plan requires the Patient to pay an annual deductible of $1,000, and 30% coinsurance towards the cost of services rendered by Out-of-Network Providers. However, the Patient's expenditures for Out-of-Network Providers' services are limited to $4,000 per year. Once that maximum is reached, the Plan covers 100% of the allowable cost of covered services by Out-of-Network providers. The Out-of-Network deductible is not included in the maximum out-of-pocket limit. Thus, the Patient's total financial exposure for Out-of-Network care during a given year is $5,000 consisting of the $1,000 deductible and the $4,000 coinsurance.

12.     The Patient receives medicine and services from Biomed. When the Patient received such medicine and services from Biomed, rather than pay Biomed first, and then collect from Oxford, he assigned his rights under the Plan with respect to those medicines and services to Biomed, including the right to collect premiums. See Exhibit A. As assignee of the Patient, Biomed has the right to collect compensation from Oxford for services rendered to the Patient.

13.     The Patient has hemophilia, a chronic bleeding disorder that requires the regular administration of large doses of a "clotting factor" on short notice to prevent a minor injury from becoming fatal. The Patient's underlying hemophilia is complicated by the presence of inhibitors in his body which cause his body to resist absorbing the clotting factors administered to him. As a result of this rare complication, his bleeding is more difficult to control and requires significantly higher doses of clotting factor than do patients without this complication. Because of the high acquisition cost of the clotting factor, as well as the significantly higher doses that the Patient receives, his treatment is extremely costly. Yet without this treatment, he will bleed to death. Maintaining a ready supply of his prescriptions is absolutely essential to the Patient's continued well-being, and this is a role Biomed fills.

14.     Biomed has not always been the Patient's service provider, however.  Before he became a patient of Biomed, another pharmacy (the "Prior Pharmacy") provided medications to the Patient.  Upon information and belief, the Prior Pharmacy was an In-Network provider with Oxford and, pursuant to its financial hardship policy, waived the portion of its charges for which the Patient was responsible.

15.     On one occasion, the Patient was having a life-threatening bleeding incident, and urgently needed his medication.  However, a representative of the Prior Pharmacy told the family that it would not supply the medication to the Patient because it had not received payment for some prior service.

16.     In response to this refusal, the family immediately (and urgently) turned elsewhere to get the clotting factor quickly so the Patient would not die.  The family ultimately requested the assistance of Access Pharmaceuticals, Inc. ("Access") – another Out-of-Network provider of intravenous and injectable medications – through Ellen Pinto, an employee of Access.  After this incident, the family used Access as its principal provider for clotting factor and related services.

17.     Subsequently, on October 5, 2007, Biomed acquired Access, and the Patient's family requested that Biomed continue to provide services to him.

18.     Upon receipt of a valid prescription and the approvals required by the Plan, Biomed began supplying the required medication and scheduled periodic visits by a registered nurse to ensure that the medication was being administered properly.

19.     When Biomed acquired Access in October 2007, it also learned that Access had granted a financial hardship waiver to the Patient, which waived the Patient's Out-of-Network deductible and coinsurance.  Biomed honored the waiver through the end of 2007.

20.     In January 2008, Biomed contacted the Patient's family to notify them that their 2007 financial hardship waiver would expire.

21.     On or about January 10, 2008, the Patient's family informed Biomed that it was experiencing financial hardship and requested a financial hardship waiver.

22.     Biomed uses a standard evaluation procedure to evaluate all financial hardship requests.   It examines a patient's individual medical needs and financial circumstances. Biomed's program is not designed to attract patients or influence a patient's choice of providers.

23.     To the extent that industry standards exist for financial hardship policies, such standards generally adhere to principles developed for the Medicare program.  Although not directly applicable, Biomed's financial hardship policy (and practice) is consistent with the provisions that govern financial hardship waivers for Medicare, including the anti-kickback safe harbor found at 42 C.F.R. 1001.952(k); the Office of Inspector General's Special Fraud Alert published in the Federal Register, dated December 19, 1994; and Section 312 of the Centers for Medicare and Medicaid Services Provider Reimbursement Manual, which prohibit a provider from:

> ➢ advertising that it will waive patient payments to induce the patient to use its services;

> ➢ routinely using financial hardship forms without making a good faith attempt to determine the beneficiary's actual financial condition;

> ➢ collecting copayments and deductibles only if the patient has other forms of coverage (*i.e.*, the terms or services are "free" to the beneficiary);

> ➢ charging higher amounts for services to patients entitled to a waiver with the higher charges intended to offset the waived coinsurance;

> ➢ failing to collect copayments or deductibles for reasons unrelated to indigency (*e.g.*, a supplier waives coinsurance or deductible for all patients from a particular hospital, in order to get referrals); and

- 5 -

> applying a different financial hardship standard, depending on the type of coverage the patient has.

24.     Biomed does not advertise the availability of a financial hardship waiver.  It is available only upon request and is based upon Biomed's determination of a patient's eligibility after verification.  (Ironically, Oxford may have violated these guidelines by "advertising" to other Biomed patients in Oxford's Explanation of Benefits ("EOBs") statements that accompany payments, which stated: "...the provider [Biomed] waives copay, coinsurance and/or deductible amounts..."  Notably, beginning on January 1, 2010, these EOBs were sent to members other than the Patient, including members who had never sought a financial hardship waiver and members who had previously been billed and, in some instances, who had paid their deductibles and coinsurance.  Biomed, however, has not violated the standards articulated above, and advertised the availability of a hardship waiver.)

25.     If a patient asks for assistance, Biomed evaluates the request, applies the same criteria and process without regard to the patient's source of coverage, makes its determination, and bills the payor the same amount without regard to the existence of a financial hardship waiver.

26.     Biomed evaluated the Patient's waiver request under its policy, including reviewing the Patient's financial situation and expected medical expenses for the year.  It inquired into the Patient's family's income, non-medical expenses, and the Patient's medical needs.  After conducting this evaluation, Biomed approved a financial hardship waiver for the Patient.

27.     Based on its financial hardship waiver determination, Biomed waived all of the Patient's charges in 2008.

28.     Similarly, in 2009 and 2010, the Patient requested financial hardship waivers from Biomed. Each year, Biomed carefully followed its financial hardship policy and protocol, and ultimately granted the Patient a waiver.

29.     Biomed has provided medication to the Patient at all times of day, including on holidays and weekends, and has had medication shipped in from locations around the country, including on short notice, to ensure his survival.

30.     Because of the Patient's assignment of his rights to Biomed, upon the provision of such medicines and services to the Patient, Biomed billed Oxford directly on behalf of the Patient. Typically, claims processed at Oxford's usual and customary allowance, and were paid in 30-60 days.

## OXFORD'S "INVESTIGATION" AND REDUCTION OF LEGITIMATE CLAIMS

31.     On March 28, 2008, Jacqueline Rivera, an employee in Oxford's Special Investigative Unit ("SIU") contacted Biomed to audit claims related to a specific list of 17 covered individuals, including the Patient, who were receiving covered services.

32.     All 17 members used Biomed's services under their Out-of-Network coverage. Ten of the 17 patients on the list had requested financial hardship waivers; seven of the 17 patients had not. Absent a financial hardship waiver, the member was billed for coinsurance and deductibles. This ratio is not, of itself, significant.

33.     Due to the nature of the services Biomed provides, a significant number of its patients have chronic conditions. Because of the nature of such conditions and the extreme costs associated with the same, many of these patients request and are found to qualify for financial hardship waivers for some or all of their financial obligations.

34.     On May 1, 2008, Biomed responded to Oxford's audit request. For each listed member on the audit request, Biomed sent Oxford service records, invoices, receipts, hardship

- 7 -

waiver requests (if the member had requested one), and Biomed's determinations with respect to such waiver requests.

35. Oxford appears to have accepted Biomed's response for each of the members on the audit list except for the response related to the Patient – for all other audited members, except the Patient, Oxford continued to pay their claims in full.

36. The Patient's bills, however, were significantly higher than bills for any others in the audit sample, due to the unusually higher dosing requirements dictated by the Patient's special chronic condition.

37. This phenomenon, however, is not particular to Biomed's services or rates, but rather is attributable to the nature of the Patient's condition. In general, hemophiliacs suffer internal or external bleeding episodes, which are called "bleeds." Patients with more severe hemophilia suffer more severe and more frequent bleeds. A hemophiliac does not bleed more intensely than a normal person, but can bleed for a much longer time. In severe hemophiliacs even a minor injury can result in blood loss lasting days or weeks, or even never healing completely. In areas such as the brain or inside joints, this can be fatal or permanently debilitating. Because of this, and the chronic nature of the disease, regular and/or immediate treatment is required in the event of a bleed; and in the Patient's case – as discussed *supra* at ¶ 13 – his resistance to clotting factor necessitates higher doses.

38. Notwithstanding the above, however, with respect to claims for services provided to the Patient on and after April 11, 2008, Oxford reduced its payments to Biomed by 30% -- the amount of "coinsurance application" under the Plan for Out-of-Network Providers' services. Oxford incorrectly assumed that the Patient never reached his annual maximum out-of-pocket amount of $4,000.

39.     This 30% reduction resulted in payments to Biomed that were significantly lower than Biomed's billed charges.

40.     Biomed was not adequately notified of this reduction, nor the reasons for Oxford's decision to cut its payments, but soon became aware that it was not receiving payment in full for medicines and services provided to the Patient.   Biomed immediately contacted Oxford to determine why it was not being paid in full.  Months of collection efforts ensued, with Biomed trying to work with Oxford to address this discrepancy.   Repeatedly stymied in its efforts to reconcile these claims, Biomed, as the Patient's assignee, filed a written appeal of the claim reductions on July 9, 2009.

41.     Meanwhile, Oxford continued its 30% reduction with respect to the Plaintiff's claims throughout the rest of 2008, and through 2009 and 2010, without regard to whether the Patient would have exceeded the $4,000 annual out-of-pocket maximum if he had been able to pay his coinsurance and had not needed a financial hardship waiver.

42.     Under the Plan, Oxford should have paid 100% of the amount billed by Biomed for the medications and services it preauthorized.  If the Patient had not qualified for a financial hardship, Oxford would apply the $1,000 deductible and $4,000 coinsurance plan requirements and deduct them from the amount owed and pay the balance.

43.     Oxford's treatment of this Patient differs from the usual practice by insurers of deducting the amount of the member's financial responsibility from the amount it would otherwise have paid.   Here, Oxford improperly ignored the out-of-pocket maximum and unilaterally reduced its payments to Biomed by 30% of the invoiced amount.

44.     Oxford's failure to recognize Biomed's legitimate financial hardship program for 2008 and 2009 effectively penalized Biomed for treating members (including the Patient) who

- 9 -

were unable to pay the deductible and coinsurance so that they might use their POS benefits –
notwithstanding that Oxford had already received and enjoyed additional premiums for its POS
coverage of these members. Oxford's decision ignored that Oxford had previously recognized
Biomed's (and others') legitimate financial hardship waivers and paid-in-full on related claims.

45.     By refusing to credit the Patient with meeting the $4,000 out-of-pocket maximum,
Oxford reduced its payment for medically necessary services to this Patient by at least
$1,506,695.87 (exclusive of interest to which Biomed is entitled under New York Law) during
the period from April 11, 2008 through April 21, 2010. Thus Oxford disproportionately profited
by over $1.5 million because of the Patient's financial hardship and resulting inability to pay
$15,000 in aggregate costs over a three year period.

## OXFORD'S ERISA VIOLATIONS AGAINST BIOMED

46.     Oxford also frustrated Biomed's efforts to rectify Oxford's inequitable reduction.

47.     Under 29 C.F.R. § 2560.503-1, an ERISA plan administrator must maintain a
claims procedure that meets certain regulatory requirements.

48.     Because Oxford contracted to provide health benefits under an ERISA plan, it
must maintain claim and appeal processes that comply with ERISA.

49.     Under 29 C.F.R. § 2560.503-1(b)(4), a plan administrator must recognize a
claimant's authorized representative to pursue a benefit claim or appeal on the claimant's behalf.

50.     Under 29 C.F.R. § 2560.503-1(g), an insurance company must provide a claimant
with adequate notice of the specific reason for any adverse benefit determination, including a
decision to reduce or deny payment for a service. If a claim is denied or the amount of the claim
is reduced, the Claimant must be given an Explanation of Benefits ("EOB") which must explain
the specific reason for the denial or reduction in a clear and reasonable manner. It must refer to
the specific plan provisions upon which its determination is based; provide a description of any

additional information necessary for the claimant to perfect a claim; explain why such information is necessary; and give a description of the plan's review procedures and time limits applicable to the procedures. If the insurer relied on an internal rule, guideline, or protocol (collectively, "rule") in making the denial or reduction in payment, the EOB should either include the rule or state which rule was applied and make it available on request.

51.     Oxford's EOBs that accompanied payment failed to provide adequate notice of the specific reason for denying claims, failed to explain the specific reasons for the reduction in payment in a manner calculated to be understood by the claimant, and failed to explain the adjustment codes. See Exhibit B.

52.     Oxford's EOBs failed to inform Biomed that Oxford required a copy of its financial hardship policy to determine that Biomed's financial hardship program was a *bona fide* financial hardship program.

53.     Under 29 C.F.R. § 2560.503-1(h)(2), an insurance company must provide a claimant or his authorized representative with a reasonable opportunity for a "full and fair review" of an adverse benefit determination.

54.     Under 29 C.F.R. § 2560.503-1(h)(3)(ii), a "full and fair review" requires that the review not simply defer to the initial adverse benefit determination. An appropriate named plan fiduciary, who is neither the individual who made the adverse benefit determination that is subject of the appeal nor the subordinate of such individual, must conduct the appeal.

55.     Under 29 C.F.R. § 2560.503-1(h)(2)(ii) – (iv), the claimant must have an opportunity to submit written comments, documents, records and other information relating to the claim or benefit. He must have reasonable access to all documents, records, and information relevant to the claim and must be afforded a review that considers all such materials submitted

by the claimant relating to the claim without regard to whether such information was submitted or considered in the initial benefit determination.

56.    When a claimant has made a valid assignment of benefits under the Plan to a provider of services authorizing the provider to pursue the claim in his stead, the provider, as the claimant's Authorized Representative must be granted these same rights.    29 C.F.R. § 2560.503-1(b)(4).  Where as here, Oxford has repeatedly made partial payment directly to Biomed, Oxford has acquiesced to the Patient's assignment to Biomed.

57.    After Oxford completed its review of Biomed's audit response, it did not provide Biomed advance notice of its determination to reduce payments for Biomed's services, or its assumption that Biomed had improperly waived member payments, nor did it request additional information about Biomed's patient collections process.

58.    Oxford did not request information about Biomed's financial hardship policies as required by 29 C.F.R. § 2560.503-1(g).

59.    Oxford's review process for Out-of-Network claims did not meet ERISA standards for a full and fair review.  In fact, Oxford's process did not provide *any* meaningful review even though Biomed explicitly stated that it was appealing as the Patient's authorized representative.

60.    As the assignee of the Patient's rights under an executed Assignment of Benefits, Biomed was the Patient's authorized representative and, as noted above, on July 9, 2009 filed a written appeal of the claim reductions.

61.    Susan Cervero, a Claims Project Manager at Oxford sent a letter, dated August 3, 2009, to Biomed stating that as an Out-of-Network Provider, Biomed had no right to appeal.

62.     Biomed responded by letter, dated August 25, 2009, informing Oxford that it was appealing as the assignee of the Patient. Oxford responded with a nearly identical letter, dated September 25, 2009, denying Biomed's right to appeal. Oxford still has not explained its failure to apply the Plan's Out-of-Pocket maximum or requested additional information, including about whether the Patient's Out-of-Pocket maximum was satisfied in whole or in part by payments to other Out-of-Network providers.

63.     When Biomed employees contacted Oxford to discuss the reduction in their payment and denied appeal rights, they were informed that all inquiries must be directed to Jacqueline Rivera who was continuing to handle this matter.

64.     In addition to her apparent role in auditing Biomed's billing practices, Rivera was involved in the decisions to refuse Biomed's appeals on behalf of the Patient.

65.     Finally, on September 28, 2009, approximately 19 months after Oxford's initial audit request, Rivera asked an attorney for Biomed to provide detailed financial documents about the Patient, including the methodology used to determine the financial hardship waiver, his family's financial documents used in the evaluation process, and Biomed's billing statements reflecting the cost of the Patient services and payments.

66.     In a letter, dated October 1, 2009, Rivera contacted Biomed requesting the detailed financial information used to evaluate the Patient's hardship waiver. Rivera indicated that Oxford required this information before it would "further consider any additional reimbursement."

67.     Biomed provided a copy of the Patient's request for waiver, copies of claims showing the amount of services provided, and a copy of its decision to grant a financial hardship waiver. The Patient's family, however, refused to authorize Biomed's disclosure of detailed

information related to its finances to Oxford. Biomed did not provide such personal financial information to Oxford.

68.     After extensive discussions between Oxford's and Biomed's counsel about whether the Patient's financial information could be turned over despite his specific objections, Oxford's counsel agreed that this information was not necessary if Biomed would provide proof that it followed a *bona fide* financial hardship determination process.

69.     On April 6, 2010, Biomed provided Oxford with a copy of its most recent financial hardship policy, adopted as of January 1, 2010. It included a detailed description of its process for responding to patient requests and its evaluation procedure.

70.     In response to Oxford's claims that Biomed routinely waived members' payments, Biomed provided Oxford with proof that it billed and collected payment from members who did not qualify for a financial hardship waiver in 2009 and 2010.

71.     On April 21, 2010, Oxford's counsel wrote:

In light of the recent evidence of collection of patient responsibility and the adoption of a formal hardship policy you provided me, we will no longer be reducing any of your client's claims by an additional amount of patient responsibility. However, we believe that our past reductions for [Patient] were justified since no out of pocket maximum was ever reached so we will not be paying anything additional on past claims.

See Exhibit C.

72.     On May 7, 2010, Oxford's counsel wrote:

With regard to [the Patient], as I stated before, we will not be adjusting our payments on his past claims, despite the existence of any hardship waiver, because we believe he did not pay his out of pocket maximum.

See Exhibit D.

73.     On May 11, 2010, Biomed provided Oxford with copies of its financial hardship policy for 2008 and 2009.

74.     On May 28, 2010, Oxford's counsel, Carolyn Ham, responded on behalf of Oxford, stating:

> "We are not going to reconsider our decision on previously reduced payments for waiving patient responsibility."

See Exhibit E.

75.     At bottom, and as Oxford itself determined, the Patient's family and Biomed complied with their obligations to Oxford.

76.     Oxford however, has refused to adjust previously paid claims despite its tacit admission that Biomed's claims on behalf of the Patient were (and are) valid, given Biomed's legitimate financial hardship program. Further, where Oxford failed to timely notify Biomed that it required certain information for its review, Oxford cannot now, after Biomed has supplied this information of its own initiative, refuse to adjust previously paid claims on this basis.

77.     Oxford's refusal is also inconsistent with its marketing of its POS plans, which purport to provide members additional choices and flexibility, in that Oxford's administration of those plans deprive members of the ability to enjoy the very benefits for which they have contracted.

## OXFORD'S INTERFERENCE WITH BIOMED'S CONTRACTS AND PROSPECTIVE BUSINESS

78.     On or about April 11, 2008, Oxford began issuing EOBs indicating that the Patient had no financial liability for Biomed's services.

79.     Oxford's EOB contained the adjustment code "D60K." The code D60K stands for the following –

> Your plan covers the actual cost of reasonable charges for covered services. The provider waives co-pay, coinsurance and / or deductible amounts. We have deducted these from the charged amounts to determine the actual cost of the services. Please submit proof of copayment for the co-pay, coinsurance and /or deductible. EVIDENCE OF WAIVER OF COINS/DED. PROVIDERS REQUEST AMOUNT REDUCED.

- 15 -

See Exhibit F.

80.     Such an EOB impacts Biomed's contractual relationship with the Patient. When an insurer or managed care plan receives a claim for payment for services rendered to a member, it prepares an EOB. It states the insurer's determination about whether the services were covered by the member's plan and the amount, it will pay for them. It also contains the insurer's calculation of the amount the member is required to pay for the services under the policy. Both the provider and the member refer to the EOB to determine the amount that the provider should bill the member.

81.     Notwithstanding any financial hardship waiver that Biomed may have granted to the Patient, Oxford's EOBs show that the Patient owed a "zero balance" for the service rendered by Biomed.

82.     By indicating on its EOB that the Patient owed nothing for Biomed's services, Oxford has precluded Biomed from billing the Patient for the deductible and coinsurance due under the Plan. In other words, Oxford has rendered those amounts a nullity, and undermined Biomed's ability to collect them from the Patient; and at the same time it is penalizing Biomed for *not* collecting them.

83.     Also, on or about January 1, 2010, the Defendant began adding the following note to its EOBs sent to members *other than* the Patient who also utilized Biomed's services, including members who had never sought a financial hardship waiver and members who had previously been billed and, in some instances, who had paid their deductibles and coinsurance:

> "YOUR PLAN ALLOWS UP TO THE REASONABLE AND CUSTOMARY ALLOWANCE FOR COVERED SERVICES OR SUPPLIES, AND EXCLUDES CHARGES THAT THE PATIENT IS NOT REQUIRED TO PAY. IT IS OUR UNDERSTANDING THAT THIS PHYSICIAN OR PROVIDER MAY WAIVE COINSURANCE AND / OR DEDUCTIBLE AMOUNTS AND MAY ACCEPT THE INSURANCE AMOUNTS PAID TO YOU AS PAYMENT IN FULL. THEREFORE,

WE HAVE REDUCED THE APPLICABLE DEDUCTIBLE AND COINSURANCE AMOUNT(S) FROM THE COVERED TOTAL TO REPRESENT THE ACTUAL COST OF THE SERVICE. IF YOU MADE ADDITIONAL PAYMENTS TO THIS PROVIDER OR PHYSICIAN, PLEASE SUBMIT PROOF OR PAYMENTS FOR REVIEW."

See Exhibit G.

84.     By inserting this note in its EOBs, Oxford is inappropriately reducing payment to Biomed for members who have neither sought nor qualified for a financial hardship waiver.

85.     As a result of this note on the EOB, Biomed has been unable to collect deductible and coinsurance due from some patients.

86.     Because these members are financially responsible for all amounts not covered by the Plan, Oxford's payment reductions shift a greater share of Biomed's costs to members.

87.     In addition, by inserting this note in its EOBs, the Defendant is inappropriately notifying members about the existence of the Plaintiff's financial hardship waiver program, thereby potentially placing Biomed under pressure to waive payments for additional patients.

88.     Oxford has also tried to deter members from choosing Biomed (or other Out-of-Network Providers) as permitted by their POS plan, and physicians from referring patients to Biomed. Upon information and belief, this is part of a pattern and practice by Oxford to market its POS plans – offering greater choice and flexibility to customers – but then to attempt to discourage its POS members from utilizing Out-of-Network care providers, often by disparaging the Out-of-Network provider.

89.     In August or September 2009, Rivera called the Patient's mother, purportedly attempting to find out if the Patient's family paid deductibles and coinsurance to Biomed, and demanding information documenting the family's finances. Rivera's tone with the Patient's mother was extremely hostile and aggressive.

90.     Rivera told the Patient's mother that Biomed was charging more money than any other home care company. Patient's mother offered to switch to another service provider if Oxford would demonstrate that Biomed's prices were significantly above fair market value, but Oxford never provided information on either point.

91.     Oxford has repeatedly called and questioned several of Biomed's patients, including the Patient's family, about the level and nature of the services provided by Biomed and attempted to convince them to obtain their services from In-Network Providers, rather than Biomed.

92.     On several occasions, patients and physicians told Biomed that Oxford representatives said that Biomed was "under investigation," "billing fraudulently," and/or "operating without a license."

93.     Oxford also contacted at least one physician who had frequently referred patients to Biomed, and falsely told his office manager that Biomed was not licensed to dispense medication in that state. That physician has not referred any patients to Biomed since that incident.

94.     Oxford falsely informed individuals at the New Jersey Department of Banking and Insurance that Biomed was dispensing pharmaceuticals in the state without the required license. The regulator has the authority and ability to penalize or interfere in Biomed's business.

95.     At all times, Biomed has maintained all required licenses for its operations in New Jersey and in other states in which it operates.

96.     Oxford's assertions that Biomed bills fraudulently, operates without a license, and is under investigation are intended to weaken or sever Biomed's relationships with its patients, thereby impacting its profitability, cash flow, ability to finance itself, and creditworthiness.

## CLAIMS

### Count One – Breach of Contract

97.     Biomed repeats and restates each and every prior allegation as if fully set forth at length herein.

98.     The Patient has an insurance policy with Oxford, and Biomed is an assignee of the benefits of that contract.

99.     Oxford previously authorized Biomed to perform services and accepted the patient's assignment of benefits to Biomed, directly paying Biomed for services rendered. Biomed's and Oxford's conduct created an implied-in-fact contract.

100.    Biomed rendered services to the Patient, and Oxford accepted the services.

101.    Biomed rendered services in good faith with the reasonable expectation of payment.

102.    Biomed has repeatedly demanded full payment of all claims that Oxford has improperly reduced.

103.    Oxford's failure and refusal to pay the balance due is a material breach of all contractual obligations.

### Count Two – Unjust Enrichment (Quantum Meruit)

104.    Biomed repeats and restates each and every prior allegation as if fully set forth at length herein.

105.    Biomed has repeatedly demanded payment of the balance Oxford owes on the Patient's claims for services rendered by Biomed, but to date, Oxford has not paid and retains the funds owed.

106.    Biomed acted and performed its obligations in good faith and in compliance with its professional obligations and custom and usage in the insurance and medical industries and with Oxford's full knowledge.

107.    Biomed has an expectation and a legal right to be compensated for the services rendered.

108.    Oxford has been unjustly enriched because it has unlawfully retained Biomed's funds for its own benefit and to Biomed's detriment.

109.    Oxford has been unjustly enriched because, by refusing to recognize Biomed's legitimate financial hardship program, it has unjustly retained 30% on all claims submitted by Biomed.

## Count Three – Quasicontract

110.    Biomed repeats and restates each and every prior allegation as if fully set forth at length herein.

111.    Biomed performed services and Oxford received a benefit.

112.    To its detriment, Biomed relied on the terms of the Patient's Plan stating that it contained an out-of-pocket maximum for services of Out-of-Network Providers. Biomed understood this maximum to apply to its services provided to patient. Additionally, as Patient's assignee, Biomed confirmed these terms of the Patient's Plan with Oxford. Until Biomed called Oxford for an explanation of reduced payments, it was unaware that the out-of-pocket "maximum" would not be recognized by Oxford.

113.    It is unfair and inequitable that Oxford retains the benefit without compensating Biomed.

### Count Four – Account Stated

114.    Biomed repeats and restates each and every prior allegation as if fully set forth at length herein.

115.    Biomed provided Oxford with an accounting of the monies owed to Biomed by Oxford, and, for a time, Oxford paid in full.

116.    Biomed rendered full and true statements of account to Oxford in connection with the medicines and services provided to the Patient.  Copies of these statements are annexed hereto as Exhibit G.

117.    There exists a specific balance due to Biomed on this account, due to Oxford's subsequent improper claim reductions.

118.    Oxford's prior (and future) payments-in-full with respect to medicines and services provided by Biomed to the Patient (notwithstanding a financial hardship waiver) – as well as its payments-in-full with respect to other members who are serviced by Biomed and have received legitimate financial hardship waivers – are an implied promise by Oxford to Biomed to pay-in-full when Biomed has granted a legitimate financial hardship waiver.

119.    Nevertheless, Oxford has not paid Biomed the balance due on the account stated.

### Count Five – Deceptive Act or Practice in Violation of GBL § 349

120.    Biomed repeats and restates each and every prior allegation as if fully set forth at length herein.

121.    New York Insurance Law Section 2601 requires insurers to attempt to effectuate fair and equitable settlements of claims in good faith where the liability has become reasonably clear.

122.    Biomed provided Oxford with the information it requested during its 2009-2010 review of Biomed's claims regarding the Patient, including proof that it followed a *bona fide* financial hardship determination process in assessing and granting waivers to the Patient.

123.    Oxford then tacitly acknowledged the sufficiency of such documentation in its decision to discontinue reducing any of the Patient's claims. In so doing, Oxford has acknowledged its liability on said claims. In the face of this admission, Oxford cannot now argue that its *past* reductions are somehow valid. Accordingly, Oxford's failure to adjust its prior paid claims is blatantly violative of the Unfair Claim Settlement Practices Act.

124.    New York General Business Law Section 349 provides that organizations may not engage in deceptive acts or practices in the conduct of any business, trade, or commerce. New York Courts have determined that failure to attempt to effectuate fair and equitable settlement of claims in good faith where liability has become reasonably clear may be considered a deceptive practice under New York General Business Law Section 349.

125.    Oxford's refusal to reimburse legitimate claims is unfair and deceptive to Biomed, the Patient, other patients, and consumers at large, as is Oxford's campaign of disinformation against Biomed.

### Count Six – Violation of ERISA, 29 C.F.R. § 2560.503-1(g)

126.    Biomed repeats and restates each and every prior allegation as if fully set forth at length herein.

127.    Under 29 C.F.R. § 2560.503-1(g), an insurance company must provide adequate notice of the specific reason for the denial of claims. Notice of denial must reference specific plan provisions, describe any additional material or information necessary for the claimant to perfect the claim, and explain why the information is necessary.

128. Oxford failed to inform Biomed that Oxford required a copy of its financial hardship policy to determine that Biomed's program is *bona fide*.

129. Oxford's EOBs contained undefined medical codes.

130. Oxford failed to adequately explain why it would not fully compensate the Patient's claims.

131. Plaintiff is entitled to relief for such violations under 29 C.F.R. § 2560.503-1(h)(3)(ii) and 29 C.F.R. § 2560.503-1(h)(3)(ii).

### Count Seven – Violation of ERISA, 29 C.F.R. § 2560.503-1(h)(3)(ii)

132. Biomed repeats and restates each and every prior allegation as if fully set forth at length herein.

133. Under 29 C.F.R. § 2560.503-1(h)(3)(ii), ERISA requires a group health plan to provide a reasonable opportunity for a full and fair review of an adverse benefit determination, including the reduction in the amount paid for a claim.

134. At all times relevant to this Complaint, the Patient's group health plan was administered by Oxford. Oxford failed to provide for a review that does not afford deference to the initial adverse benefit determination and that is conducted by an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal nor the subordinate of such individual.

135. On information and belief, Rivera was involved in the initial decision to audit Biomed's collection practices, its decision to reduce payment to Biomed, and its decision to deny Biomed its right to appeal on behalf of the Patient.

136. Oxford's failure to provide an effective appeal process for Biomed as assignee of the Patient's right and its failure to give Biomed access to an impartial decision-maker for its appeals denied Biomed a full and fair review in violation of ERISA.

137.   Plaintiff is entitled to relief for such violations under 29 C.F.R. § 2560.503-1(h)(3)(ii) and 29 C.F.R. § 2560.503-1(h)(3)(ii).

### Count Eight – Violation of ERISA, 29 U.S.C. A. § 1104(a)(1)(A)

138.   Biomed repeats and restates each and every prior allegation as if fully set forth at length herein.

139.   Under 29 C.F.R. § 2560.503-1(h)(3)(ii), a fiduciary must act solely in the interest of participants and their beneficiaries, and for the exclusive purpose of providing benefits to participants and their beneficiaries.

140.   The Patient is a participant under ERISA.

141.   Biomed is the Patient's lawful beneficiary.

142.   Oxford has refused to adjust prior reduced claims, notwithstanding that such decision is unfounded, and such adjustments are appropriate in light of Oxford's prior actions and policies, as well as its present actions and policies.

143.   Oxford's improper partial denial of compensation for valid claims constitutes a violation of its fiduciary duties to Biomed.

144.   Plaintiff is entitled to relief for such a violation under 29 C.F.R. § 2560.503-1(h)(3)(ii).

### Count Nine – Prima Facie Tort

145.   Biomed repeats and restates each and every prior allegation as if fully set forth at length herein.

146.   Oxford knew that Biomed provided services to many of its members, including Patient, and other third parties.

147.   Oxford intentionally and without justification induced those parties to seek avoidance of payment by advertising Biomed's financial hardship policy.

148.    Oxford's actions caused patients who might otherwise have paid their deductible and coinsurance to Biomed to fail to pay.

149.    Oxford intentionally and without justification sought to interfere with Biomed's contracted right to payment by nullifying monies owed to it under the Plan.

150.    Oxford also knew that Biomed received referrals from other medical practitioners.

151.    Oxford intentionally and without justification disseminated false information about Biomed to induce those practitioners to avoid making further referrals to Biomed.

## PRAYER FOR RELIEF

WHEREFORE, Biomed respectfully requests that this Court enter judgment in its favor against Oxford and provide the following relief:

a)      compensatory damages of at least $1,506,695.87 for improperly paid claims;

b)      accrued statutory interest on all such amounts since the time they became due;

c)      attorneys' fees; collection costs, all other fees, costs, and disbursements incurred in connection with this lawsuit to defend against Oxford's action to escape insurance coverage obligations and unreasonable bad faith reductions; and all other damages to be determined at trial;

d)      compensatory damages resulting from Biomed's inability to collect deductibles and coinsurance from patients after Oxford improperly notified them than Biomed waived patient payments;

e)      compensatory damages resulting from patients that Biomed lost or did not receive as a result of Oxford's false and/or misleading statements;

f)      restitution;

g)      an order requiring Oxford to pay the outstanding balance due to Biomed in addition to accrued interest and costs to collect the balance due;

- 25 -

h)     such other and further relief, at law and equity, as the Court deems just, proper, and appropriate.

## **JURY TRIAL DEMANDED**

Plaintiff demands trial by jury on all issues so triable.

October 12, 2010                    Respectfully submitted,

Michael Dillon
MCDERMOTT WILL & EMERY LLP
340 Madison Avenue
New York, New York  10173
(212) 547-5400

Steven E. Siff*
MCDERMOTT WILL & EMERY LLP
201 South Biscayne Blvd. – 22nd Floor
Miami, Florida  33131-4336

Thomas J. Force
LAW OFFICE OF THOMAS J. FORCE
2 West Main Street – 2nd Floor
Bay Shore, New York  11706


*Attorneys for Plaintiff Biomed Pharmaceuticals Inc.*


\* Motion for admission *pro hac vice* forthcoming

## CERTIFICATE OF SERVICE

I certify under penalty of perjury that, pursuant to 28 U.S.C. §1746, on Tuesday, October 12, 2010, I served the accompanying Amended Complaint via Federal Express for Priority Overnight delivery upon the following parties:

Michael H. Bernstein
Sedgwick, Detert, Moran & Arnold LLP
125 Broad Street, 39th Floor
New York, New York 10004

Dated: New York, New York
      October 12, 2010

                                          _____
                                            Amelia J. Crowley

NYK 1180735-1.009900.0011